# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL HARDIN,<br><br>    Plaintiff,<br><br>  vs.<br><br>CAROLYN COLVIN, Commissioner of Social Security,<br><br>    Defendant. | CAUSE NO. 1:14-cv-381-DKL-JMS |

## ENTRY

The Commissioner of Social Security denied Michael Hardin's applications for disability benefits under the Social Security Act and he brought this suit for judicial review. Briefing is complete and the issues are ready for decision.

## Standards

Judicial review of the Commissioner's factual findings is deferential: courts must affirm if her findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that

Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B). 20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966. The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B) and 1382c(a)(3)(G). 20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further. At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the applicant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling. 20 C.F.R. 404.1525. If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy,

together with any additional non-exertional restrictions. At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled. Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy. 42 U.S.C. ▪ 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled. If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level. Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics. *Lee v.*

*Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

**Background**

Mr. Hardin applied for both disability-insurance and supplemental-security-income benefits under the Social Security Act. (R. 115-27.) In his applications, he alleged

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

that he is disabled due to "bad knees, back pain, arm pain, hard to stand for long," (R. 148), and that he became disabled on January 1, 2009, (R. 115, 122). He alleged that he can no longer walk or stand for a long time or lift, sit, or sleep well because of great pain in his knees and feet. (R. 196, 200, 202.) He claimed that he cannot lift more than fifteen pounds and is able to stand, walk, or sit for only an hour before needing to rest for an hour. (R. 200.) He finds it hard to sit for long periods of time because of knee pain. (R. 202.) He also alleged that he had breathing difficulties ("bad breathing") when climbing stairs. (*Id.*) Over a year later, at his October 2012 hearing, Mr. Hardin testified that his knees are the only impediment to working, (R. 37), although he still has a little problem with breathing, (R. 39). At the hearing, he also pushed forward his alleged onset date by almost two years, to December 4, 2010, when he would turn fifty years old. (R. 33.)

Mr. Hardin's applications were denied on initial and reconsideration reviews by the state agency. (R. 43-54, 58-71.) He requested and received a hearing before an administrative law judge of the Social Security Administration. (R. 31-42.) He and a vocational expert testified. (*Id.*) Mr. Hardin was represented by counsel at the hearing.

At step one of the sequential evaluation process, the ALJ found that Mr. Hardin had not engaged in substantial gainful activity since his previously alleged onset date of January 1, 2009. At step two, the ALJ found that Mr. Hardin has the severe impairment of degenerative joint disease of the knee. At step three, he found that Mr. Hardin does not have an impairment or combination of impairments that meet or medically equal any of the conditions in the Listing of Impairments. For the purposes of steps four and five,

the ALJ determined that Mr. Hardin has the RFC for light work, with additional exertional and postural limitations.  At step four, the ALJ found that Mr. Hardin has no past relevant work.  At step five, relying on the opinion of the vocational expert, the ALJ found that a significant number of jobs that Mr. Hardin can perform exists in the national economy and, therefore, he is not disabled.  (R. 17-26.)   When the Commissioner's Appeals Council denied Mr. Hardin's request for review, (R. 1-4), the ALJ's decision became the final and operative decision of the Commissioner on Mr. Hardin's claims.

Mr. Hardin applied for benefits in May 2011.  (R. 115-27.)  The record shows the following chronology.

**June 30, 2011 — consultative examination.**  After receiving his application, the state agency sent Mr. Hardin to Ibrar Paracha, M.D., for a physical examination, which was performed on June 30, 2011.  Mr. Hardin reported to Dr. Paracha that he was disabled due to back and knee pain.  He also reported shortness of breath and dyspnea on exertion, a one-block walking limit, a twenty-minutes standing limit, and the ability to lift fifteen pounds with each arm.  Dr. Paracha's reported his impression as positive for bilateral knee crepitus; more pain in the left knee; lumbar spine tenderness; hip pain; severely limited gait due to pain; Mr. Hardin "will definitely benefit from an assistive device;" and it is unlikely that Mr. Hardin could stand for two hours in an eight-hour workday or lift more than ten pounds at a time.  Dr. Paracha stated that imaging of the lumbar spine and both knees was needed.  (R. 252-55.)

7

**July 2011 — knee and spine x-rays, pulmonary test.** After receiving Dr. Paracha's report, the state agency ordered bilateral knee and lumbar-sacral x-rays and a pulmonary function study. (R. 256.) The pulmonary test was performed on July 21, 2011. (R. 258-59.) The x-rays were performed on July 23, 2011 and showed, for both knees, trace joint effusion with no acute bony abnormality or other significant degenerative change and, for the spine, minimal intervertebral disc space narrowing at L4-5 with no acute bony abnormality. (R. 261.) There is no supplemental report by Dr. Paracha based on these test results and no indication that the results were sent to him for review.

**August 2011 — initial decision.** Based on Dr. Paracha's report, the x-rays, the pulmonary test results, and Mr. Hardin's application materials, (R. 60),[2] Joseph N. Gaddy, M.D., a state-agency physician completed a Physical RFC form, (R. 262-69), and, together with a state-agency disability examiner, approved initial-decision Disability Determination and Transmittal ("DDT") forms finding no disability, (R. 43, 44, 60). Dr. Gaddy's opinions, recorded in his Physical RFC form, differ from Dr. Paracha's opinions. For example, Dr. Gaddy concluded that Mr. Hardin could lift and/or carry more (twenty pounds occasionally and ten pounds frequently), (R. 263); that he could stand/walk and sit more (about six hours in an eight-hour day for each), (*id.*); and that the clinical findings do not support any benefit of an assistive device, (R. 268). Dr. Gaddy found that Mr.

---

[2] The "application materials" include disability, work-history, daily-activities, medicine, and medical-treatment reports completed by Mr. Hardin, and earnings/contributions reports produced by the Social Security Administration. The Wishard Memorial Hospital records that were obtained by the state agency and cited by its reviewers as having been considered in their initial and reconsideration decisions, (R. 60, 67), apparently are unrelated to Mr. Hardin's asserted impairments, (R. 244-51).

8

Hardin was "partially credible due to totality of clinical findings exceeding alleged severity." (R. 267.)

**October 2011 — reconsideration decision.** Based on the same reports, (R. 67), a different state-agency physician affirmed Dr. Gaddy's physical RFC opinions, (R. 270), and, together with a different disability examiner, approved reconsideration-decision DDT forms finding no disability, (R. 45, 46).

**November 22, 2011 — request for hearing.** Mr. Hardin requested a hearing before an ALJ. (R. 73-74.)

**December 2011 and April 2012 — emergency-room visits, knee arthrocentesis, and x-ray.** Mr. Hardin was seen in the emergency room of Wishard Memorial Hospital on December 7, 2011, reporting back and joint pain; on December 11, 2011, reporting back pain, numbness, and tingling, worse with standing, and incontinence; and on April 21, 2012, reporting week-long pain on his right side, from his shoulder to his knee. On his first visit, he was prescribed hydrocodone (Vicodin) and ibuprofen for pain. On his third visit, a knee arthrocentesis (fluid drain) and right-knee x-ray were performed. The x-ray showed mild degenerative joint disease. (R. 276.) The hospital physician diagnosed traumatic/bloody effusion of the right knee. (R. 275.)

**May through August 2012 — physical therapy .** Mr. Hardin presented for five physical-therapy sessions. At the first session, the physical therapist recommended assessment by an orthopedic specialist. At the last appointment, on August 1, 2012, the

9

therapist determined that Mr. Hardin had reached maximum rehabilitation potential and discharged him with instructions for home exercises.

**June 28, 2012 — orthopedic examination.** Nathaniel Evans, M.D., performed a consultative orthopedic examination of Mr. Hardin. The results were unremarkable except for diffuse tenderness to palpation along the superior medial side of the patella. Dr. Evans interpreted imaging to show some mild patella/femoral arthritis but no other fracture or abnormality. He had some concern that Mr. Hardin might have subluxed his patella and torn his medial patellofemoral ligament. He recommended an MRI to rule out other pathology and he recommended that Mr. Hardin continue with physical therapy.

**September 23, 2012 — MRI.** Follow-up imaging showed some abnormalities in Mr. Hardin's right knee.

**October 22, 2012 — hearing.** No additional records were submitted following the hearing.

### Discussion

Mr. Hardin argues four errors in the ALJ's decision.

**1. Weight assigned to Dr. Paracha's opinion.** After examining Mr. Hardin, Dr. Paracha's opinion was, in part, that he has a severely limited gait due to pain, he will definitely benefit from an assistive device, and it is unlikely that he could stand for two hours in an eight-hour workday or lift more than ten pounds at a time. The vocational

expert testified that the jobs that he identified that Mr. Hardin could perform would be eliminated if he were limited to standing for only two hours in an eight-hour workday. (R. 40.) The vocational expert was not asked, by either the ALJ or Mr. Hardin's attorney, about the effect of a requirement for an assistive device or a ten-pound lifting limit.

The ALJ assigned Dr. Paracha's opinion "little weight" because "the record is lacking in objective evidence that would support the physician's limitations. Additionally, the limitations noted are not supported by the clinical findings noted by the physician." (R. 23.) The ALJ identified neither the objective evidence that would have supported Dr. Paracha's limitations nor the inconsistent clinical findings. Necessarily, he also failed to explain why the objective evidence in the record fails to support the limitations or why the clinical findings are inconsistent. The ALJ explained only that he gave "[m]ore weight" to the opinion of Dr. Gaddy, the state-agency physician who made the initial determination, and he gave his opinion "great weight" because "it remains consistent with the objective medical evidence of record and is supported by the clinical findings noted of record," (R. 23-24), but, again, the ALJ did not identify the consistent objective evidence or the supportive clinical finding that he had in mind.

The only evaluation that Dr. Gaddy made of Dr. Paracha's opinion was that "[c]linical findings in file do not support" his opinion that Mr. Hardin will benefit from an assistive device and, therefore, "it is given little weight," (R. 268), but the doctor, like the ALJ, failed to identify any inconsistent clinical findings even for that limited finding. In addition, as noted in the chronology above, at the time of Dr. Gaddy's evaluation, the

11

relevant record consisted only of Dr. Paracha's examination report and the first knee and spine x-rays; Dr. Gaddy could not have reviewed the quantity of later submitted evidence. Thus, the ALJ's reliance on Dr. Gaddy's opinion does not supply the gaps in the ALJ's articulation of his evaluation of Dr. Paracha's opinion.

In her response, the Commissioner offers her own reasons why Dr. Paracha's opinions should have be given little weight, but they are her reasons, not the ALJ's, and the Court reviews the ALJ's reasons. Moreover, the Commissioner mischaracterizes Dr. Gaddy's opinions. For example, she states that Dr. Gaddy found Dr. Paracha's opinion "unsupported, so much so that he ordered radiological testing," (*Defendant's Memorandum in Support of the Commissioner's Decision* [doc. 29] ("*Response*") at 10), when, in fact, Dr. Paracha himself recommended that imaging of Mr. Hardin's lumbar spine and knees be obtained and the only suggestion of a reason why Dr. Gaddy ordered radiological testing is this recommendation by Dr. Paracha. There is no indication that Dr. Gaddy independently found Dr. Paracha's opinions 'so unsupported' that more testing was needed. In addition, the Commissioner states that Dr. Gaddy "explained why he rejected the limitations set forth by Dr. Paracha," (*id.*), but, as noted, Dr. Gaddy explained only why he rejected Dr. Paracha's opinion that Mr. Hardin would benefit from an assistive device, not Dr. Paracha's standing or lifting opinions.

The Commissioner suggests her own reason for rejecting Dr. Paracha's ten-pound lifting restriction, namely that Mr. Hardin himself said that he could lift fifteen pounds. (*Response* at 11.) However, again, this reason was not articulated by the ALJ or Dr. Gaddy

and the Commissioner merely observes the two facts but does not affirmatively state that they are inconsistent. Moreover, it is not evident that Mr. Hardin would have a readier familiarity with precise weights that he can lift than Dr. Paracha.[3]

Because the ALJ failed to minimally articulate his analysis of the weight to assign to Dr. Paracha's opinions, that portion of his decision is unreviewable and, therefore, unsupported by substantial evidence and the result of legal error.

2. **Weight assigned to Dr. Gaddy's opinion.** The ALJ wrote:

> The State's agency medical consultant determined the claimant was capable of performing work at the light exertional level with occasional performance of all postural activities, and avoidance of concentrated exposure to temperature extremes, and respiratory irritants. The consultant's assessment has been considered in making this [RFC] determination and is given great weight as it remains consistent with the objective medical evidence of record and is supported by the clinical findings noted of record.

(R. 23-24 (citation omitted).) There is no dispute that Dr. Gaddy's opinion was based solely on Dr. Paracha's report of his examination and the first knee and lumber spine x-rays. Dr. Gaddy did not have the benefit of the medical and other evidence submitted later, which comprises most of the record.

Apparently recognizing this difficulty, the ALJ wrote that he assigned Dr. Gaddy's opinion "great weight" because it "*remains* consistent with the objective medical evidence of record" and "is *supported* by the clinical findings noted of record." (*Id.* (emphases

---

[3] The Court notes that the ALJ found that Mr. Hardin could lift twenty pounds occasionally, (R. 20), which exceeds even Mr. Hardin's estimate of fifteen pounds, if credited, without any explanation of why the ALJ discounted Mr. Hardin's estimate.

13

added).) But not only does the ALJ fail to cite the objective evidence and findings or explain why they are consistent and supportive of Dr. Gaddy's opinions, his conclusions must derive from his own evaluations of the later-submitted medical evidence, but those would be medical judgments that the ALJ is not qualified to make. The Commissioner argues that, although the state-agency physicians (Dr. Gaddy, who made the initial determination, and Fernando R. Montoya, M.D., who performed the reconsideration determination and affirmed Dr. Gaddy's initial opinions) did not examine the later-submitted evidence, "they did examine more evidence tha[n] Dr. Paracha did" and Mr. Hardin's reliance on the September 2012 MRI is improper because "the record contains no doctor's interpretation of that single-page document." (*Response* at 10.) The former point's relevance to supporting the ALJ's assignment of great weight to Dr. Gaddy's opinions is obscure, to say the least, and the latter point tends also to impugn the ALJ's own evaluation of the later-submitted evidence.

By failing to minimally articulate his rationale for the weight assigned to Dr. Gaddy's opinions, the ALJ committed legal error and prevents judicial review, and by relying on his own evaluation of later-submitted medical evidence, his assignment of weight to Dr. Gaddy's opinion is not supported by substantial evidence and the result of legal error.

**3. RFC finding — need for an assistive device.** The ALJ did not include the need for an assistive device in his RFC or in his hypotheticals to the vocational expert. As noted, Dr. Paracha's opinion was that Mr. Hardin "will definitely benefit from an

14

assistive device." (R. 255.) The ALJ wrote that his RFC is "consistent with the objective medical evidence of record documenting the claimant's normal gait without the use of an assistive device." (R. 24.) (The ALJ also favored Dr. Gaddy's no-assistive-device opinion over Dr. Paracha's opinion, but, as discussed above, both the ALJ's and Dr. Gaddy's opinions on this matter are unexplained and, thus, erroneous.)

The ALJ failed to identify or even allude to the "objective medical evidence" that documents Mr. Hardin's normal gait without an assistive device. As Mr. Hardin points out, the record contains evidence over time of his abnormal gait, instability, use of an assistive device, and his stated need for an assistive device while standing and walking. Neither the ALJ, nor any medical source after Dr. Gaddy, evaluated any of this evidence in relation to Mr. Hardin's need for an assistive device.[4] Thus, the ALJ's rationale is not minimally articulated to permit review.

The Commissioner's attempt, again, to fill the gaps fails. She states that, "while" Dr. Paracha recommended an assistive device, he also noted that Mr. Hardin presented to the examination without one. (*Response* at 10-11.) The ALJ made a similar observation. (R. 23 (Dr. Hardin presented to the examination without a cane, "though" Dr. Paracha recommended one).) There are two problems with these statements.[5] First, they are only

---

[4] Additionally, in neither the ALJ's nor the parties' factual summaries of the record does the Court find mention of a finding of a normal gait. Notably, the Commissioner did not cite any such reference in her *Response*.

[5] Another problem is that Mr. Hardin's presentation to the examination without an assistive device is hardly objective *medical* evidence.

15

observations, or recitations, of two circumstances — Mr. Hardin's presentation without a can and Dr. Paracha's recommendation of one — and the use of "while" and "though" do not convert them into definite evaluations or judgments that the court can review. Neither the ALJ nor the Commissioner *find* or *conclude* that Mr. Hardin's presentation without a cane is inconsistent with Dr. Paracha's recommendation for one and the Court declines their implicit invitations to assume that they have done so. Second, even if the ALJ had found an inconsistency, that finding would not be supported by substantial evidence. The Court can safely assume, absent evidence or argument to the contrary, that most physician recommendations for the use of assistive devices are made to patients who are not already using them at the time the recommendations are made.

The rationale for the ALJ's implicit rejection of Mr. Hardin's stated need, and Dr. Paracha's recommendation, for an assistive device is not sufficiently articulated to allow judicial review and is, therefore, legally erroneous. The Court notes that Mr. Hardin's counsel did not ask the vocational expert about the effect of a requirement for an assistive device on the number of existing jobs to which he testified, but it strikes the Court that it likely will not be an insignificant effect.

**4. Mr. Hardin's credibility.** Mr. Hardin asserts three errors in the ALJ's credibility finding.

**a. Assistive device.** The ALJ discounted Mr. Hardin's alleged need for an assistive device based on evidence showing a normal gait without one. As discussed above, the

16

ALJ did not cite such evidence and none is apparent to the Court; therefore, this finding is erroneous.

**b. Medicines.** In discussing the credibility factor of the "type, dosage, effectiveness, and side effects of any medication," 20 C.F.R. § 404.1529(c)(3)(iv) and S.S.R. 96-7p, the ALJ wrote that "[t]here is no evidence of record that supports the claimant uses more than over-the-counter pain medication for his knee impairment." (R. 23.) Mr. Hardin points out, and the Commissioner concedes, that Mr. Hardin had been prescribed hydrocodone (Vicodin), a narcotic, for his pain. This was clear error by the ALJ. The Commissioner's apparent attempt to save the ALJ's finding by arguing that, while Mr. Hardin was prescribed hydrocodone twice, "on other occasions, such medications were absent . . . .", (*Response* at 12), is not convincing. It has been shown that the ALJ made a significant error regarding Mr. Hardin's medications, which renders his larger credibility determination erroneous.

**c. Activities of daily living.** In discussing this factor, the ALJ wrote that "[t]he claimant's activities of daily living are not as limiting as one would expect, given his allegation of totally disabling symptoms." (R. 23.) The ALJ had just cited Mr. Hardin's reports that he prepared meals, completed household chores, used public transportation, shopped in stores, was social with others, participated in church, and did not have difficulty getting along with others," so the Court assumes that these are the activities that the ALJ found inconsistent. (*Id.*) But by failing to explain how these activities are inconsistent with which of Mr. Hardin's symptom-severity and functional-limitations

17

allegations, and the same not being self-evident, the Court cannot review the ALJ's rationale. Mr. Hardin did not allege that his symptoms render him bedridden or otherwise incapable of all activity. Although an ALJ's credibility determination is due deference, a court's review is more demanding to the extent that the determination is based on objective inconsistencies and not the ALJ's personal observations. Here, it is just that type of objective inconsistency that the ALJ relied upon but the ALJ has given the Court no rationale to which to accord any deference.

Mr. Hardin also argues that the Court of Appeals for the Seventh Circuit has cautioned ALJs (and district courts) about equating a claimant's ability to perform activities of daily living with the claimant's ability to perform the demands of substantial gainful activity in the workplace. However, the Court agrees with the Commissioner that there is a difference between an ALJ assuming such an equality and an ALJ relying on an inconsistency between activities and allegations to support a credibility finding. The Court finds that the ALJ's evaluation of Mr. Hardin's activities of daily living was for the purpose of his determination of Mr. Hardin's credibility which, while it can have an indirect effect on the ALJ's overall determination of Mr. Hardin's RFC, was not a direct factor in the ALJ's RFC determination.

The ALJ's articulation of his evaluation of Mr. Hardin's activities of daily living was erroneous, which also renders his credibility determination erroneous.

## Conclusion

The ALJ's decision will be reversed and remanded for a rehearing that is consistent with the rulings herein. Specifically:

**1.** The Commissioner shall, sufficiently to permit review, articulate the rationale for the weight assigned to Dr. Paracha's opinions that Mr. Hardin's gait is severely limited due to pain, that he will definitely benefit from use of an assistive device (*i.e.*, that his gait and station deficiencies are severe enough to require an assistive device), and that he cannot stand for two hours during an eight-hour workday or lift more than ten pounds at one time. The Commissioner should specifically identify inconsistent objective medical evidence and/or clinical findings if she relies thereon, and explain the inconsistencies.

**2.** The Commissioner shall, sufficiently to permit review, articulate the rationale for the weight assigned to Dr. Gaddy's opinions, particularly his implicit rejections of Dr. Paracha's opinions in the context of the evidence that was submitted after Dr. Gaddy's opinions were rendered. If the Commissioner finds that Dr. Gaddy's opinions are consistent with or confirmed by objective medical evidence or clinical findings, then she shall specifically identify the evidence and findings and explain why they are consistent.

**3.** The Commissioner shall explain her rationale for omitting a requirement for an assistive device from Mr. Hardin's RFC. If she finds that the need for an assistive device is inconsistent with objective medical evidence, clinical findings, or other evidence in the record, then she must identify that evidence and explain why it is inconsistent.

**4.** The Commissioner shall reconsider her determination of Mr. Hardin's credibility regarding the severity of his symptoms and their functionally limiting effects. Particularly, as discussed above, she must address the deficiencies in the ALJ's evaluations of Mr. Hardin's need for an assistive device, his medications, and his activities of daily living. The Commissioner shall articulate her rationale for her credibility findings sufficiently to permit review.

**5.** The Commissioner shall consider whether to obtain the opinions of a medical expert on the effects of the later submitted evidence on the above issues specifically and on her disability decision generally.

The Court does not hold that the record in its present state does or does not contain substantial evidence to support the ALJ's ultimate findings and conclusions. The errors found herein are largely the result of a conclusory and cursory decision, *i.e.*, the ALJ's failure to sufficient articulate his rationale to permit review. However, the Court only questions at this point whether the lack of expert medical opinion evaluating the evidence that was submitted after the state agency's reconsideration denial would render a mere rearticulation by the Commissioner futile.

**DONE this date:** 03/23/2015

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.